## PACIFIC TELEPHONE & TELEGRAPH CO. *v.* TAX COMMISSION OF WASHINGTON.*

No. 544.   Argued January 13, 1936.—Decided March 2, 1936.

---

* Together with No. 529, *Northern Pacific Ry. Co.* v. *Washington,* and No. 573, *Great Northern Ry. Co.* v. *Washington,* both on appeal from the Supreme Court of Washington.

*Mr. Otto B. Rupp,* with whom *Messrs. Maurice Mc-Micken, Alfred J. Schweppe,* and *Alfred Sutro* were on the brief, for Pacific Telephone & Telegraph Co., appellant in No. 544.

*Mr. Lorenzo B. da Ponte,* with whom *Mr. Dennis F. Lyons* was on the brief, for Northern Pacific Ry. Co., appellant in No. 529.

*Mr. Thomas Balmer,* with whom *Messrs. F. G. Dorety* and *Edwin C. Matthias* were on the brief, for Great Northern Ry. Co., appellant in No. 573.

408

*Mr. R. G. Sharpe,* Assistant Attorney General of Washington, and *Mr. Walter L. Baumgartner,* with whom *Mr. G. W. Hamilton,* Attorney General, was on the brief, for appellees.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

The State of Washington laid upon practically all persons engaged in intrastate business an occupation tax effective August 1, 1933, to continue for twenty-four months. The tax is measured by a percentage of the gross income solely of that business; and, as construed, purports not to tax the privilege of doing interstate business. The rate for telephone companies is 3 per cent; for railroads, 1½ per cent. Laws of Washington, 1933, c. 191. No. 544 is a suit by Pacific Telephone & Telegraph Company against the Tax Commission to enjoin proceedings to enforce the tax. No. 573 is an action by the State against Great Northern Railway to collect the tax for the period ending December 31, 1933. No. 529 is a like action against Northern Pacific Railway. Each company is a foreign corporation. The cases are here on appeals from the Supreme Court of the State and were argued together. Each presents the question whether the statute, as applied, is obnoxious to the commerce clause of the Federal Constitution. The railroads claim also that the statute violates the due process clause by taxing income earned outside the State. In each case the trial court held the statute void. The Supreme Court sustained its validity in all the cases. 183 Wash. 697, 698, 33; 48 P. (2d) 931, 938.

None of the companies rests its challenge of the statute primarily upon proof that the tax, in fact, burdens interstate commerce. The Telephone Company relies wholly, and the railroads mainly, upon an alleged rule of law— the proposition that when a foreign corporation engages within a State in both local and interstate commerce, an occupation tax laid upon the local business is necessarily void, unless the corporation is free in law and in fact to withdraw therefrom without discontinuing its interstate business. They urge that the alleged rule applies to

them, claiming that inability to abandon the local business without also discontinuing the interstate is imposed by state and federal law, and arises also from practical considerations. They insist that the rule applies although the tax is not such in character or amount as to induce withdrawal from the local business. The railroads contend further that the tax, in fact, burdens interstate commerce.

The trial court found, and the Supreme Court assumed, that practical considerations would prevent either of the railroads from abandoning its intrastate business without also withdrawing from the interstate. And this was assumed to be true of the Telephone Company. The operations of the two classes of business are inextricably intertwined. In the main, they are carried on at the same time, by the same employees, with the same plant, equipment, and facilities. The interstate business is found profitable when carried on in connection with the local, because the expenses of the joint operation are, under applicable accounting rules, apportioned between the two branches of the business. Withdrawal from local business would reduce by but a small percentage each company's cost of operation. The remaining unavoidable expense would be heavier than the interstate business could bear under the existing rates or under any conceivable increase. Moreover, the trial court ruled, and the Supreme Court assumed, that the governing law would not permit these corporations to withdraw from local business without discontinuing also the interstate.

The State denies the existence of the alleged rule of law that an occupation tax upon intrastate business is necessarily void, if the corporation is not free to withdraw from the local business without discontinuing also the interstate. There is no denial that a tax upon the privilege of engaging in the local business is void if, by reason of its character or amount, it, in fact, imposes a direct

burden upon interstate commerce. The State insists that this tax does not do so.

*First*. Where interstate and intrastate commerce are served by the same instrumentalities of a common carrier, it is possible that a regulation of the State applied directly to the intrastate business only may in fact burden the interstate. Where this occurs Congress may remove the burden, since state regulation must yield to its paramount power to assure adequate interstate service. That power is comprehensive; and has, under appropriate legislation, been extensively exercised. Through the Interstate Commerce Commission, Congress has commanded the raising of local rates where they were so low that the intrastate traffic did not bear its fair share of the cost of the service. It has prevented state authorities from compelling the erection of a union station so expensive as unduly to deplete the financial resources of the carrier. It has prevented the construction of an intrastate branch line which would have depleted the financial resources of the builder or of another interstate carrier. It has curtailed existing local service and authorized abandonment of a controlled line, despite the carrier's contract with the State to maintain the line. Such control over intrastate commerce exists because it is a necessary incident of freeing interstate commerce from burdens, obstructions or discrimination. It has been exerted wherever Congress deemed that the State's power to regulate and promote intrastate commerce is exercised in such a way as to prejudice the interstate. *Colorado* v. *United States,* 271 U. S. 153, 164–166.

Similarly, where interstate and intrastate commerce are served by the same instrumentalities of the carrier, it is possible that a tax applied directly to the privilege of doing the local business may in fact burden the related interstate business. While a State may tax the privilege of engaging in local business, as it may regulate local

rates, it may not tax the privilege of engaging in interstate commerce. Taxation being one of the forms of regulation, *Lehigh Valley R. Co.* v. *Pennsylvania,* 145 U. S. 192, 200, any tax laid directly upon the privilege is void even in the absence of legislation by Congress or a finding of prejudice. As local rates may be so low, and the circumstances such, that these rates must be raised in order to protect interstate commerce, so a tax on the privilege of engaging in local business may conceivably be so high, and the circumstances such, as to require lowering of the tax in order to protect interstate commerce. But the high tax on the local privilege, like the low rate for the local traffic, if it burdens interstate commerce at all, does so by reason of its consequences. This being so, a tax upon the local privilege only must be held valid in the absence of proof that it imposes an undue burden upon interstate commerce. "The question of constitutional validity is not to be determined by artificial standards." See *Gregg Dyeing Co.* v. *Query,* 286 U. S. 472, 480. The alleged indirect tax must be judged by its practical operation.

In its effect upon interstate commerce an occupation tax solely upon local business does not differ from an *ad valorem* property tax upon tangible property used exclusively in such business. Each increases the necessary cost of doing the local business. Either might conceivably be so large as to render the local business immediately unprofitable. A common carrier cannot be compelled to carry on business indefinitely at a loss. *Brooks-Scanlon Co.* v. *Railroad Commission,* 251 U. S. 396; *Bullock* v. *Florida,* 254 U. S. 513, 520–521; *Railroad Commission* v. *Eastern Texas R. Co.,* 264 U. S. 79, 85. If, because of such loss, a corporation, seeing no prospect of betterment, wished to discontinue its local business and were prevented by law from doing so unless it discontinued also its interstate business, the law might be held void as im-

posing an unconstitutional condition upon the privilege of engaging in interstate commerce. Compare *Pullman Co.* v. *Adams,* 189 U. S. 420. If it was the tax which caused the unprofitableness of the local business and, consequently, the desire to discontinue it, the tax would then appear as a direct burden on interstate commerce. Compare *Postal Telegraph-Cable Co.* v. *Richmond,* 249 U. S. 252, 258; *Postal Telegraph-Cable Co.* v. *Fremont,* 255 U. S. 124, 127. But no reason has been suggested why a tax upon the local business should be held void, if despite its burden, the local business is conducted at a profit; or if, although conducted at an apparent loss, the corporation desires to continue it because of benefits present or prospective. Compare *Ohio Tax Cases,* 232 U. S. 576, 590.

*Second.* Inherently the tax challenged is unobjectionable. It is not upon an instrumentality of interstate commerce; it is moderate in amount; and is not a disguised attempt to discriminate against interstate commerce. As the collection is being made by an action at law, the tax is not open to the objection raised in *Western Union Telegraph Co.* v. *Massachusetts,* 125 U. S. 530, 554, that payment may be made a condition of continuing to do business. Compare *Underwood Typewriter Co.* v. *Chamberlain,* 254 U. S. 113, 119. The tax is "imposed solely on account of the intrastate business"; and it appears "that the amount exacted is not increased because of the interstate business done." Compare *East Ohio Gas Co.* v. *Tax Commission,* 283 U. S. 465, 470. Although the two branches of the business of the companies are inseparable, the tax is not laid inseparably upon both. Thus, it is not open to the objection held fatal in *Leloup* v. *Mobile,* 127 U. S. 640, and *Cooney* v. *Mountain States Telephone & Telegraph Co.,* 294 U. S. 384. "Certainly, one cannot avoid a tax upon a taxable business by also engaging in a non-taxable business." *Raley & Bros.* v. *Richardson,* 264 U. S. 157, 159.

The distinction drawn by those cases between an occupation tax valid because laid only on local business and one void because laid inseparably upon the whole business, is clearly shown in the discussion of the two classes of taxes involved in *Bowman* v. *Continental Oil Co.,* 256 U. S. 642, 646–647. Taxes for the privilege of doing local business measured by the gross income of such business have frequently been laid upon concerns engaged in both intrastate and interstate business; and have, for half a century, been sustained without enquiry whether withdrawal from the local business would compel discontinuance of the interstate. That an occupation tax upon a foreign telegraph company measured by earnings from its local business is valid, was indicated as early as *Telegraph Co.* v. *Texas,* 105 U. S. 460, 464–465; and was definitely held in *Ratterman* v. *Western Union Telegraph Co.,* 127 U. S. 411, which has been repeatedly cited with approval in cases involving interstate railroads and telegraph companies.[1] Similarly, in *Southern Ry. Co.* v. *Watts,* 260 U. S. 519, 529–530, a so-called franchise tax for the privilege of doing intrastate business, measured by a percentage of the value of property subject also to an *ad valorem* tax, was sustained as against both foreign and domestic railroads.

No decision of this Court lends support to the proposition that an occupation tax upon local business, otherwise valid, must be held void merely because the local and interstate branches are for some reason inseparable. In

---

[1] *Western Union Telegraph Co.* v. *Pennsylvania,* 128 U. S. 39, 40; *Western Union Telegraph Co.* v. *Alabama,* 132 U. S. 472, 476–477; *Lehigh Valley R. Co.* v. *Pennsylvania,* 145 U. S. 192, 201; *Postal Telegraph Cable Co.* v. *Charleston,* 153 U. S. 692, 697; *Postal Telegraph Cable Co.* v. *Adams,* 155 U. S. 688, 698. See also *Pacific Express Co.* v. *Seibert,* 142 U. S. 339, 349–350; *Cornell Steamboat Co.* v. *Sohmer,* 235 U. S. 549; *Ohio Tax Cases,* 232 U. S. 576, 591–593. Compare *Osborne* v. *Florida,* 164 U. S. 650; *Kehrer* v. *Stewart,* 197 U. S. 60.

cases relied upon by appellants there are expressions which may seem to support that contention. But in none of those cases was the challenged tax measured by the gross income of the intrastate business only. In some it was laid inseparably upon the privilege of doing both interstate and intrastate business.[2] In some the case was suggested of a compulsory local service which, coupled with a tax, might burden interstate commerce.[3] In *Western Union Telegraph Co.* v. *Kansas,* 216 U. S. 1, and *Pullman Co.* v. *Kansas,* 216 U. S. 56, the question presented, and on which the Court divided, was whether payment of a confessedly unconstitutional tax could be made a condition of permitting a foreign corporation to exercise the privilege of continuing to do intrastate business within the State.[4] It is true that in *Sprout* v. *South Bend,* 277 U. S. 163, 171, the Court, when reciting the essentials of a valid license fee for doing local business, said that it must appear "that the person taxed could discontinue the intrastate business without withdrawing also from the interstate." [5] But that statement was made in discussing the validity of a flat bus license fee, prescribed by an ordinance which made no distinction between busses en-

[2] *Allen* v. *Pullman Car Co.,* 191 U. S. 171, 179; *Galveston, H. & S. A. Ry. Co.* v. *Texas,* 210 U. S. 217; *Adams Express Co.* v. *New York City,* 232 U. S. 14.

[3] *Pullman Co.* v. *Adams,* 189 U. S. 420; *Allen* v. *Pullman Car Co.,* 191 U. S. 171, 182–183; *Postal Telegraph-Cable Co.* v. *Richmond,* 249 U. S. 252, 258; *Postal Telegraph-Cable Co.* v. *Fremont,* 255 U. S. 124, 127.

[4] The statute was held, or assumed, to be inherently unconstitutional, because it was measured by a percentage of the authorized capital of the companies and was, therefore, a tax upon all their property without and within the State.

[5] See *East Ohio Gas Co.* v. *Tax Commission,* 283 U. S. 465, 470; *Cooney* v. *Mountain States Telephone & Telegraph Co.,* 294 U. S. 384, 393, where the passage was repeated. Compare *Interstate Busses Corp.* v. *Holyoke Street Ry. Co.,* 273 U. S. 45, 51.

gaged exclusively in interstate commerce, those engaged exclusively in intrastate commerce, and those engaged in both classes of commerce; and it must be read in that context. The license fee was held void, because Sprout, who was engaged in both classes of commerce, could not escape payment of the tax by confining himself to interstate business. The cases cited by the Court in that connection were of the same character.[6]

*Third.* The Telephone Company relies wholly upon the alleged rule of law. It makes no claim that the tax laid upon it in fact burdens interstate commerce. Nor could it do so. The company's business, both the intrastate and the interstate, was conducted at a profit during the tax period. The net operating income from the local business for the year 1933 was $781,338.44, after deducting taxes assignable thereto; the net operating income from the interstate business was $118,225.74.[7] The tax for the five months ending December 31, 1933, is apparently $112,251.31. Not only is the intrastate business (even with the addition of this tax) no burden; it is that branch of the business which makes it financially possible to carry on the interstate. The gross operating revenues from interstate business were in 1933 only $932,424.74, while the total operating expenses of the company within the State were $7,649,933.89. The greater part of these expenses involved plant, equipment facilities, and employees' services indispensable to the conduct of the in-

---

[6] *Leloup* v. *Mobile,* 127 U. S. 640; *Crutcher* v. *Kentucky,* 141 U. S. 47, 58; *Adams Express Co.* v. *New York City,* 232 U. S. 14, 30; *Bowman* v. *Continental Oil Co.,* 256 U. S. 642, 647. Compare *Williams* v. *Talladega,* 226 U. S. 404, 417; *Postal Telegraph-Cable Co.* v. *Richmond,* 249 U. S. 252.

[7] The gross operating revenues from the intrastate business were $9,317,598.94; the net, $2,221,631.73. The net operating revenues from the interstate business were $282,728.59. Here, as elsewhere, no account is taken of a return on the cost or value of the property.

418

terstate business: of the total expenses, $7,009,241.85 was charged to the intrastate business and only $640,-692.04 to the interstate. As the statute is valid in the absence of a showing that the tax in fact directly burdened interstate commerce, the judgment against the Telephone Company is affirmed.

*Fourth.* The Great Northern, besides invoking the alleged rule of law, claims that in fact the tax upon it directly burdens interstate commerce. The amount for the five months ending December 31, 1933, is $12,988.35. To prove that this tax burdens interstate commerce, it presented accounts which, as the trial court found, show that in the year 1933 the intrastate business resulted in a net operating deficit of $99,269. But, even if the items in the account are correct, it does not follow necessarily that the local business (with the tax upon it) directly burdens interstate commerce. The contrary appears. The gross operating revenues from the intrastate business were $2,179,760. To it were charged $1,730,361 of the company's operating expenses, leaving net operating revenues amounting to $449,399. The deficit of $99,269 is arrived at by deducting from these net revenues both railway tax accruals to the amount of $335,247,[8] and equipment and joint facility rentals to the amount of $213,421. It is true that, according to this allocation of the joint expenses and charges, it appears that the intrastate business was carried on at a small loss. But it is conceded that withdrawal from intrastate business and carrying on the interstate alone would have subjected the company to a very heavy loss. As the trial court found: "The net result of abandonment by defendant of its intrastate passenger and freight business in order to escape the tax imposed by said Chapter 191, Laws of 1933, would be the loss of $2,179,760 [the whole intrastate gross operating

---

[8] *Ad valorem* taxes paid in Washington in 1933 totalled $1,238,385.

revenues], and the saving of not more than 14% of that amount."

It is said that the deficit from the intrastate branch of the business was paid from profits of the interstate branch; and it is asserted that, as the tax would increase the amount of the deficit, it directly burdens interstate commerce. But this does not follow. Every tax, and every other charge or item of expense, reduces to that extent the profit which otherwise would be made from doing business. This tax lessens the benefit derived by interstate commerce from the joint operation with it of the intrastate business; but because of the advantage to the company (and to interstate commerce) in continuing to do the intrastate business, neither the tax of $12,988.35 here in question, nor the other taxes allocated to the local business, would induce the company to withdraw from the local business, even if it were permitted by law to do so. There is no more reason for saying that the $12,988.35, because an occupation tax, directly burdens interstate commerce, since it contributes to the operating deficit, than that the $335,247 taxes paid by local business under other statutes confessedly valid, do so. Since this tax is laid upon intrastate commerce only and is not shown to be a direct burden upon interstate commerce, or to be otherwise objectionable, the judgment against the Great Northern is affirmed. Compare *Postal Telegraph-Cable Co.* v. *Richmond,* 249 U. S. 252, 257, 261; *Postal Telegraph-Cable Co.* v. *Fremont,* 255 U. S. 124; *Williams* v. *Talladega,* 226 U. S. 404, 417.

*Fifth.* The Northern Pacific, besides invoking the alleged rule of law, claims also that the tax upon it directly burdens interstate commerce. The relevant facts are similar to those concerning the Great Northern; and the same rules of law govern both. The amount of the tax for the five months ending December 31, 1933, is $36,116.22. To prove that this tax in fact burdens inter-

state commerce, the company presented accounts which, as the trial court found, show that in the year 1933, the intrastate business resulted in a net operating deficit of $192,507. On the other hand to have abandoned the intrastate business while operating the interstate would have cost the company gross operating revenues of $5,271,893. Since the occupation tax challenged is not shown to be a direct burden upon the company's interstate business, the judgment against it is affirmed.

What has been said above disposes of the contention of the railroads that the statute violated the due process clause. It also renders unnecessary consideration of the additional reasons urged by the State in support of the judgments of its Supreme Court. On these we express no opinion.

*Affirmed.*